UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AMANDA WARD,

      Plaintiff,

v.                                 Case No. 8:10-CV-2640-EAK-TGW

CASUAL RESTAURANT CONCEPTS
INC., d/b/a APPLEBEE'S,

      Defendant.

_____/

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS cause is before the Court on Defendant, Casual Restaurant Concepts, Inc.'s

("CRC"), Motion for Summary Judgment. (Doc. 26). The Court reviewed the Motion for

Summary Judgment, as well as Plaintiff, Amanda Ward's ("Ward"), Response in Opposition

thereto. (Doc. 27).  For the reasons set forth below, the Motion for Summary Judgment is

**GRANTED** in part and **DENIED** in part.

### Statement of the Facts

The following facts are submitted by the parties in support and/or in opposition to the

motion for summary judgment. The Court recognizes these as "facts" only in regard to resolution

of the pending motion.

CRC is a Florida corporation that is a franchisee of Applebee's International, Inc., and

owns and operates Applebee's restaurants throughout Central Florida. (Doc. 26–1 ¶ 3).  Ward

began working at CRC's Big Bend Applebee's restaurant in December 2009 and was employed

1

by CRC until April 2010. (Doc. 26–3 p. 22). Ward was employed as a full-time host and was responsible for seating guests and cleaning tables. (Doc. 26–3 p. 24).  Chris Harrington ("Harrington") was a manager at the Big Bend Applebee's, and Ward typically worked with Harrington a few times each week throughout the course of her employment. (Doc. 26–3 p. 26). Ward alleges that Harrington made unrequited, amorous comments and gestures toward her during her employment at Applebee's that made her feel uncomfortable. (Doc. 1 ¶ 14).

Harrington, and other managers, purportedly used employees' cell phones, without permission, to make survey calls to Applebee's national survey hotline posing as actual customers to give the branch positive performance reviews. (Doc. 27–4 p. 67–72; Doc. 27–5 p. 22–24).  Harrington took Ward's cell phone to make survey calls on April 6, 2010, and forwarded a semi-nude photograph of Ward to his own phone. (Doc. 27–1, Exhibits "E", "F" & "G"). On April 17, 2010, after looking through the deleted items on her cell phone, Ward became aware that someone had forwarded her personal photograph to a number that she did not recognize. (Doc. 26–3 p. 37, 40–41). On April 18, 2010, Ward's co-worker Heather Williams ("Williams") confirmed that the number the photograph was forwarded to belonged to Harrington. (Doc. 26–3 p. 41–43). Additionally, Harrington sent Ward's personal photograph to a restaurant patron and showed the photograph to other Applebee's employees. (Doc. 27–1, Exhibit "E").  Harrington allegedly told other employees that he and Ward were having a sexual relationship and that the photograph was taken in his bathroom. (Doc. 26-5, Exhibit "2").

On or around April 21, 2010, Ward informed the Head Manager, Lisa Tully ("Tully"), that Harrington had taken her cell phone, that he forwarded her semi-nude photo to himself and others, and that he was telling customers and employees that he had a sexual relationship with Ward. (Doc. 26–3 p. 54). Tully asked Ward to prepare a written statement documenting what

2

had occurred. (Doc. 26–5, Exhibit "2" ). Additionally, Ward contacted the police and filed a police report concerning Harrington's actions. (Doc. 27–1, Exhibit "B"). While the matter was being investigated, Tully told Ward that she could either temporarily transfer to a nearby Applebee's restaurant or work on shifts when Harrington was not working. (Doc. 26–3 p. 71). Ward elected to work on the days that Harrington was not working. (Doc. 26–3 p. 157–158). Ultimately, Harrington was issued a written reprimand, disqualified from promotion for six months, and was transferred to a different Applebee's restaurant. (Doc. 26–1, Exhibit "2").

Tully informed Ward that Harrington was being transferred to a different location and that Todd Hunt, a restaurant patron who Harrington sent the photograph to, was required to delete the photograph from his cell phone. (Doc. 26–3 p. 55, 69). On April 22, 2010, Ward resigned her employment from Applebee's, claiming that she could not continue to work in an environment where an unknown number of employees and patrons had seen her private photograph and heard rumors that she had a sexual relationship with Harrington. (Doc. 1 ¶ ¶ 34–35).

Ward alleges that CRC had actual and constructive knowledge of Harrington's sexually harassing conduct yet refused to conduct a meaningful investigation and failed to take any corrective or ameliorative action. (Doc. 1 ¶ 36). In particular, Tully failed to consult CRC's Sexual Harassment Skill Book during the investigation of Ward's claims and failed to contemporaneously take written statements from each witness while conducting the investigation. (Doc. 27–6 p. 52–60, 83–84, 90–91).

3

### Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–324 (1986). That burden can be discharged if the moving party can show the Court that there is "an absence of evidence to support the nonmoving party's case." *Id.* at 323, 325. When the moving party has met this initial burden, the nonmoving party must then designate specific facts showing that there exists some genuine issue of material fact in order to defeat summary judgment. *Id.* at 324. In ruling on state-law claims, such as the tort claims at issue in the case at bar, the Court must follow state—that is, Florida—law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938) (citing *Balt. & Ohio R.R. Co. v. Baugh*, 149 U.S. 368, 401 (1893)).

Issues of fact are "genuine" only if a reasonable jury, considering the evidence presented, could find for the nonmoving party. *Anderson*, 477 U.S. at 249. Material facts are those that will affect the outcome of the trial under governing law. *Id.* at 248; *Hickson Corp. v. Northern Crossarm Co.*, 357 F.3d 1256, 1259–1260 (11th Cir. 2004). In determining whether a material issue of fact exists, the court must consider all evidence in the light most favorable to the nonmoving party. *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 656 (11th Cir. 1983). If the determination of the case rests on which competing version of the facts or events is true, the case should be submitted to the trier of fact and the motion for summary judgment should be denied.

4

*Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987). The weighing of evidence and

the consideration of the credibility thereof are issues of fact to be determined by the jury at trial.

*See Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1299 (11th Cir. 1983)

(stating that the Court's function is not to decide issues of fact, but rather to determine if issues

of fact exist).

**Discussion**

**A.       Sexual Harassment**

In Count I, Ward brings a claim of hostile work environment based on sexual harassment

against CRC under Title VII and the Florida Civil Rights Act ("FCRA"). (Doc. 1). Ward's

hostile work environment claim under the FCRA shall be treated the same as her hostile work

environment claim under Title VII. *Moren v. Progress Energy, Inc.*, 2008 WL 3243860 at *9

(M.D. Fla. Aug. 7, 2008) (noting that, "Florida courts have held that decisions construing Title

VII are applicable when considering the Florida Civil Rights Act").

"To establish a hostile-environment sexual-harassment claim under Title VII based on

harassment by a supervisor, an employee must show: (1) that he or she belongs to a protected

group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual

advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the

harassment must have been based on the sex of the employee; (4) that the harassment was

sufficiently severe or pervasive to alter the terms and conditions of employment and create a

discriminatorily abusive working environment; and (5) a basis for holding the employer liable."

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).   Here, CRC argues that the

conduct alleged by Ward is neither sufficiently severe nor pervasive as to alter the terms and

conditions of her employment and create a hostile work environment.

To determine whether the harassment was sufficiently severe or pervasive to create a hostile work environment, both an objective and subjective analysis must be conducted. *Id.* at 1246. The Supreme Court and the Eleventh Circuit "have identified four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993)). Under an objective analysis, "[t]he courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Id.* Additionally, "[t]he employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Id.*

In the case at bar, there are genuine issues of material fact concerning whether the harassment objectively altered the terms or conditions of Ward's employment and created a hostile work environment. Examining the four factors set out by the Supreme Court and the Eleventh Circuit, under the totality of the circumstances, a reasonable jury could find that the harassment by Harrington objectively altered the terms or conditions of Ward's employment and created a hostile work environment.

First, Ward argues that the harassment was not an isolated incident—Ward claims she experienced multiple incidents of sexual harassment because Harrington not only took her picture for his personal use, but he also showed the picture to other employees and a restaurant

6

patron, told other employees that he was having a sexual relationship with Ward, and told other employees that the photograph was taken in his bathroom.

Second, Ward argues that the conduct was sufficiently severe to alter the terms of her employment because she could only continue to work at Applebees if she were to accept the condition that multiple coworkers and a restaurant patron had seen her semi-nude photograph. Further, Ward claims that the harassment caused her to file a police report, also pointing to the severity of the conduct. (Document 27–1, Exhibit "B").

Third, Ward argues that Harrington's conduct amounts to much than a mere offensive utterance: Harrington procured her sensitive photograph without permission, showed it to various employees as well as a restaurant patron, and spread "rumors" about her to other employees. Ward further argues that she was humiliated by Harrington's harassing conduct. In a written statement, Ward claims, "[Harrington] has humiliated me and has made it very uncomfortable for me to work here." (Doc. 26–5, Exhibit "2").

The fourth factor in the objective analysis considers whether the harassing conduct "unreasonably" interferes with the employee's job performance. Ward testified in her deposition, and presented testimony by multiple coworkers, that the harassment was sufficiently severe to interfere with her job performance. In her deposition, Ward states, "I was just so humiliated that I couldn't work." Mr. Correa, one of Ward's coworkers, testified in his deposition that "[t]here was nothing [Tully] could do to save [Ward's] job." (Doc. 27–3 p. 70). Further, Miss Williams testified that the only way Applebee's could rectify the situation was to "take [Harrington] out" and that "you would have to quit on your own," indicating that she would have felt compelled to quit if she were in Ward's position. (Doc. 27–8 p. 57–58). Here, the question of "reasonableness" must be determined by the jury because Ward has presented

evidence that creates a genuine issue of material fact over whether Harrington's harassment "unreasonably" interfered with her job performance.

Under a subjective analysis, Ward argues that she subjectively perceived the harassment by Harrington to be sufficiently severe and pervasive to alter the terms or conditions of her employment. First, Ward argues that she subjectively perceived that harassment to be severe when she learned that Harrington had taken her semi-nude photograph from her cell phone. Further, she argues that her subjective feelings of humiliation increased when she learned that Harrington had shown the photograph to numerous coworkers and a restaurant patron. Additionally, she subjectively perceived the conduct to be severe when she learned that Harrington allegedly spread "rumors" to other employees that he was having a sexual relationship with Ward. Here, the jury must determine whether Ward's subjective feelings that the conduct was sufficiently severe to alter the terms or conditions of her employment were objectively reasonable.

For the reasons set forth above, we find that a reasonable jury, considering the evidence, could find that the harassment experienced by Ward was sufficiently severe or pervasive to alter the terms and conditions of employment and create a hostile work environment; thus, summary judgment is precluded on Ward's hostile work environment claims under Title VII and the FCRA. This Court notes that denying summary judgment as to Ward's hostile work environment was a "close call." However, this Court has chosen to remain cautious and grant Ward the opportunity to present her evidence at trial and allow a jury to determine whether she will ultimately prevail in her sexual harassment claims under Title VII and the FCRA.

B.     *Faragher/Ellerth* **Affirmative Defense**

CRC argues that even if Ward can establish actionable sexual harassment claims, the affirmative defense set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), precludes her from recovering on those claims. (Doc. 15 p. 9). "In order to successfully utilize the *Faragher/Ellerth* defense, an employer must prove that: (1) the employer exercised reasonable care to prevent and promptly correct the sexual harassment; and (2) the employee unreasonably failed to take advantage of any protective or corrective opportunities offered by the employer, or otherwise failed to avoid harm." *Speaks v. City of Lakeland*, 315 F. Supp. 2d 1217, 1227 (M.D. Fla. 2004) (quoting *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765).

However, an employer may only raise the *Faragher/Ellerth* defense if there was no "tangible employment action" taken by the harassing supervisor. *Id.* at 1224. A tangible employment action requires more than actionable harassment: "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

Here, there is no evidence that Harrington engaged in any tangible employment action against Ward. Therefore, it must be decided whether any genuine issue of material fact exists as to the required elements of the *Faragher/Ellerth* defense. For the reasons set forth below, summary judgment is denied as to CRC's *Faragher/Ellerth* defense because genuine issues of material fact exist as to the required elements of the defense.

### i.     CRC's Reasonable Care to Prevent Sexual Harassment

First, CRC argues that it exercised reasonable care to prevent the alleged sexual

harassment by Harrington.   The Eleventh Circuit has found that an employer exercises

reasonable care to prevent sexual harassment when the employer maintains and promulgates a

comprehensive anti-harassment policy that contains reasonable complaint procedures and serves

a deterrent purpose. *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1306 (11th

Cir. 2007); *Walton v. Johnson & Johnson Servs., Inc.,* 347 F.3d 1272, 1286–1287 (11th Cir.

2003).   CRC claims that it exercised reasonable care to prevent the alleged sexual harassment by

maintaining an anti-sexual harassment policy (Doc. 26–1, Exhibit "1") and disseminating that

policy to all new employees during orientation.   The policy states that CRC will not tolerate

sexual harassment, provides that no employee will be subject to retaliation for reporting sexual

harassment, and provides alternative individuals to whom complaints of harassment may be

made. (Doc 26–1, Exhibit "1").

Assuming, without deciding, that CRC has established that it exercised reasonable care to

prevent the alleged sexual harassment, summary judgment must still be precluded because there

are genuine issues of material fact as to whether CRC exercised reasonable care to correct the

harassment and whether Ward unreasonably failed to take advantage of any reasonable

corrective action taken by CRC.

### ii.     CRC's Reasonable Care to Correct Sexual Harassment

Here, CRC argues that it took reasonable care to correct the alleged sexual harassment by

conducting employee interviews, taking immediate steps to ensure that Harrington and Ward did

not work together during the investigation, requiring Harrington and Hunt to delete Ward's

photograph, issuing Harrington a written reprimand (Doc 26–1, Exhibit "2"), removing

10

Harrington from the promotion list for six months, and transferring Harrington a different Applebee's location.

However, Ward argues that CRC failed to take reasonable corrective action. "A threshold step in correcting harassment is to determine if any occurred, and that requires an investigation that is reasonable given the circumstances." *Baldwin,* 480 F.3d at 1303. Ward argues that Tully failed to conduct a meaningful investigation by failing to consult CRC's Sexual Harassment Skill Book during the investigation of Ward's claims and failing to contemporaneously take written statements from each witness while conducting the investigation. Ward also argues that Tully's investigation was insufficient because she failed to identify all of the individuals who had been shown her photograph.

"Additionally, remedial measures are deemed reasonable when they 'stop the harassment, correct its effects on the employee, and ensure that the harassment does not recur.'" Here, Ward argues that CRC did not correct the effects of Harrington's harassment by failing to take corrective measures, such as additional sexual harassment training or sensitivity training, to ensure that Ward could continue to work at the Big Bend Applebee's without further embarrassment or humiliation. (Doc. 27–3 p. 71; Doc. 27–5 p. 38).

Based on the above stated facts, there is a genuine issue of material fact as to the reasonability of CRC's corrective actions, thus, this issue is appropriate for the jury and summary judgment is precluded.

### iii.   Ward's Reasonable Use of Preventative or Corrective Opportunities

"An employee's failure to take advantage of preventive or corrective measures can take two forms—not using the procedures in place to promptly report any harassment and not taking advantage of any reasonable corrective measures the employer offers after the harassment is

11

reported." *Baldwin,* 480 F.3d at 1303. CRC argues that Ward failed to take advantage of CRC's reasonable corrective measures by deciding to resign her employment before reporting Harrington's actions and by resigning even after she became aware that Harrington was being transferred to another store.

However, Ward argues that even if CRC's corrective actions are found to be reasonable, Ward's resignation of employment was reasonable under the totality of the circumstances. Ward presents testimony by Mr. Correa, another Applebee's employee, who states that "there was nothing [Tully] could do to save [Ward's] job." (Doc. 27–3 p. 70). Considering the context of Ward's employment, where multiple employees had previously seen her semi-nude photograph and heard rumors that she had a sexual relationship with Harrington, a reasonable jury, considering the evidence, could find that it was reasonable for Ward to resign employment, despite Harrington's transfer. Therefore, summary judgment is precluded as to CRC's *Faragher/Ellerth* defense.

## C.   Constructive Discharge

In Count II, Ward brings a claim of constructive discharge against CRC under Title VII and the FCRA. Ward's constructive discharge claim under the FCRA shall be treated the same as her constructive discharge claim under Title VII. *Moren,* 2008 WL 3243860 at *9 (noting that, "Florida courts have held that decisions construing Title VII are applicable when considering the Florida Civil Rights Act"). "A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" *Fitz v. Pugmire Lincoln-Mercury, Inc.,* 348 F.3d 974, 977 (11th Cir. 2003) (quoting *Poole v. Country Club of Columbus,* Inc., 129 F.3d 551, 553 (11th Cir.1997)). Additionally, "[t]he standard for proving constructive discharge is higher

12

than the standard for proving a hostile work environment." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir.2001).

Viewing the evidence in the light most favorable to the plaintiff, Ward has presented evidence that Harrington procured her sensitive photograph without permission, showed it to various employees as well as a restaurant patron, and spread "rumors" about her to other employees. Ward claims that she was forced to resign employment because she was humiliated and that she could only continue to work at Applebee's if she were to accept the condition that multiple coworkers and a restaurant patron had seen her semi-nude photograph. Ward further claims that transferring to another location was not a viable option because she did not own a car and did not have available transportation to get to and from the alternative work site, which was twenty miles further from her home. (Doc. 27-8 p. 23). Here, the question of "reasonableness" must be determined by the jury because Ward has presented evidence that creates a genuine issue of material fact as to whether Harrington's harassment caused her working conditions to be so intolerable that a reasonable person in Ward's position would have been compelled to resign.

**D.    Retaliation**

In Count II, Ward brings a claim of retaliation against CRC under Title VII and the FCRA. Ward's retaliation claim under the FCRA shall be treated the same as her retaliation claim under Title VII. *Moren,* 2008 WL 3243860 at *9 (noting that, "Florida courts have held that decisions construing Title VII are applicable when considering the Florida Civil Rights Act").

To establish a *prima facie* case of retaliation under Title VII, Ward must prove that: (1) she engaged in statutorily protected activity (2) she suffered an adverse employment action: and (3) there is a causal connection between the participation in the protected activity and the adverse

employment decision." *Id.* Here, it is undisputed that Ward engaged in statutorily protected activity by complaining to Tully about Harrington's actions. However, Ward is unable to establish that she suffered an adverse employment action. Ward admitted in her deposition that she chose the option of working on days when Harrington was not scheduled and that she did not lose any work time by choosing this option. (Doc. 26–3 p. 71–72). Further, Ward admits that Tully did not prohibit her from working at Applebee's after she made her complaint (Doc. 26–3 p. 71). Ward also admitted that she did not have any indication or evidence that anyone at Applebee's intended to retaliate against her after she made her complaint (Doc. 26–3 p. 128).

For the reasons stated above, Ward has failed to present facts establishing the second and third elements of a *prima facie* case of retaliation. Because there is a complete absence of evidence that CRC retaliated against Ward after she made her complaint, summary judgment is granted as to Ward's retaliation claim in Count II of the complaint.

### E.   Punitive Damages

Ward seeks punitive damages for the claims asserted in Counts I and II of the complaint pursuant to the Civil Rights Act of 1991. (Doc. 1 p. 7–9).

Punitive damages are available under the Civil Rights Act of 1991 if "the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981(b)(1). In order for the issue of punitive damages to reach a jury in a Title VII case, a plaintiff "must come forward with substantial evidence that the employer acted with actual malice or reckless indifference to [the plaintiff's] federally protected rights." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1280 (11th Cir. 2002) (citing *Kolstad v. Am. Dental Assn.*, 527 U.S. 526 (1999)). To obtain punitive damages, "a Title VII plaintiff

14

must show either that the discriminating employee was 'high up the corporate hierarchy' or that 'higher management' countenanced or approved [the employee's] behavior. *" Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1323 (11th Cir. 1999).

Here, there is no evidence that CRC acted with actual malice or reckless indifference to Ward's federally protected rights. Moreover, there is no evidence that any "higher management" engaged in or approved of the discriminatory acts of which Ward alleges. *See Id.* (finding that store managers of Wal-Mart were not considered to be high enough in Wal-Mart's corporate hierarchy to allow their discriminatory acts to be basis for punitive damages against the corporation). First, Harrington is not high enough in the corporate hierarchy to be considered "higher management;" therefore, his discriminatory behavior is not sufficient to establish a basis for punitive damages against the corporation. *Id.* Assuming, without deciding, that Tully could potentially be classified as "higher management" for purposes of establishing punitive damages, there is no evidence that Tully condoned or approved Harrington's discriminatory behavior.

For the reasons set forth above, summary judgment is granted as to Ward's requests for punitive damages asserted in Counts I and II.

**F.     State Tort Claims**

Ward has asserted state tort claims for invasion of privacy (intrusion), invasion of privacy (public disclosure of private facts), and defamation in Counts IV, V, and VII of the complaint, respectively. Because summary judgment must be granted as to all relevant counts if vicarious liability is not established, it must first be determined whether Ward's charge of vicarious liability survives summary judgment.

"Under the doctrine of respondent superior, an employer cannot be held liable for the tortious or criminal acts of an employee, unless the acts were committed during the course of the

15

employment and to further a purpose or interest, however excessive or misguided, of the employer." *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.,* 783 So. 2d 353, 356 (Fla. 3d Dist. App. 2001). In order for conduct to be considered within the scope of employment, "Florida law requires that the conduct (1) must have been the kind for which the employee was employed to perform; (2) must have occurred within the time and space limits of his employment; and (3) must have been activated at least in part by a purpose to serve the employment." *Spencer v. Assurance Co. of Am.,* 39 F.3d 1146, 1150 (11th Cir.1994); *Iglesia Cristiana,* 783 So. 2d at 357. Assuming, without deciding, that Harrington's conduct was of the kind for which he was employed to perform and occurred in the time and space limits of his employment, CRC still cannot be held liable for Harrington's actions because the purpose of his conduct was not to serve the employment.

Here, Harrington's conduct was not motivated by a purpose to serve CRC. Ward argues that Harrington was motivated to serve CRC's business interests by using Ward's cell phone to submit a positive call to a customer survey line. However, this argument must be rejected. Harrington testified that the survey calls were intended for customers to rate their "food and service" at a particular restaurant location. (Doc. 27–4 p. 66). He further testified that employees were not permitted to make survey calls. (Doc. 27–4 p. 72, 75). Calls by employees posing as customers served to provide incorrect survey results and obviously undermined the company's interests in legitimately evaluating and improving customer service at individual restaurants. Further, Harrington testified that he did not make the survey calls to benefit Applebee's. (Doc 27–4 p. 73). Ward also conceded in her testimony that Harrington was not acting on behalf of the company or benefiting the company when he forwarded her picture to himself. (Doc 26–3 p.

16

132–133).  Therefore, there is no evidence that Harrington's conduct served to further a purpose or interest of CRC.

Further, in response to CRC's motion to dismiss, Ward argued that Harrington took Ward's cell phone and had access to her personal photograph through the exercise of his managerial authority in implementing Applebee's cell phone policy.  However, this argument must also fail because there is no evidence that Harrington took Ward's cell phone through the exercise of his managerial authority in implementing Applebee's cell phone policy.  Here, Harrington took Ward's cell phone, made a survey call, sent her photograph to himself, then returned her phone to the host stand.  This evidence does not establish that Harrington was exercising his managerial authority in implementing Applebee's cell phone policy.

Alternatively, Ward argues that CRC ratified or condoned Harrington's tortious conduct.  (Doc 1 ¶ 41).  Under Florida law, "[r]atification of an agent's prior unauthorized actions occurs when the principal is fully informed of the agent's act and affirmatively manifests an intent to approve that act." *Stalley v. Transitional Hospital Corp. of Tampa, Inc.*, 44 So. 3d 627, 631 (Fla. 2d Dist. App. 2010).  Moreover, "ratification cannot be presumed simply by the principal's lack of action." *Id*.  Here, there is no evidence that CRC ever manifested an intent to approve of Harrington's conduct; thus, this argument must also fail. For the reasons set forth above, summary judgment is granted as to Counts IV, V, and VII.  Accordingly it is

**ORDERED** that CRC's Motion for Summary Judgment is **DENIED** as to Count I, Ward's constructive discharge claim in Count II, and CRC's *Faragher/Ellerth* Affirmative Defense.  CRC's Motion for Summary Judgment is **GRANTED** as to Counts IV,V, and VII, Ward's retaliation claim in Count II, and Ward's request for punitive damages in Counts I and II.

**DONE AND ORDERED** in Chambers at Tampa, Florida, this _/57_ day of March, 2012.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to: All parties and counsel of record.